[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2010
JOHN LEY
CLERK

No. 09-10964

_____

D. C. Docket No. 04-01559-CV-WBH

ANDREW GRANT DEYOUNG,

Petitioner-Appellant,

versus

DERRICK SCHOFIELD,

Respondent-Appellee,

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 25, 2010)

Before DUBINA, Chief Judge, EDMONDSON and HULL, Circuit Judges.

HULL, Circuit Judge:

Georgia death-row inmate Andrew Grant DeYoung ("DeYoung") appeals

the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After review and oral argument, we affirm.

## I. BACKGROUND

### A. The Murders

On June 14, 1993, DeYoung murdered his parents, Kathryn and Gary DeYoung, and his fourteen-year-old sister Sarah DeYoung.[1] DeYoung planned the murders with David Hagerty. DeYoung v. State, 493 S.E.2d 157, 161 (Ga. 1997). DeYoung told Hagerty he wanted to kill his family to get money to start a business.

DeYoung and Hagerty planned to kill DeYoung's parents, his sister Sarah, and his sixteen-year-old brother Nathan by slashing their throats and then to set fire to the family's home to cover up the evidence. Id. On the night of the murders, DeYoung went upstairs, where his parents and sister were sleeping, and sent Hagerty to Nathan's downstairs bedroom. Id.

> DeYoung stabbed his mother repeatedly while she was sleeping in her bedroom upstairs; her screams awakened his father. As [DeYoung] struggled with his father, DeYoung's sister Sarah came to the doorway of their parents' bedroom. DeYoung slashed his father to death, and then stabbed and killed Sarah in the hallway. Hagerty heard a commotion upstairs, and changed his mind about killing Nathan.
>     Nathan . . . heard stomping and banging noises coming from upstairs, and he heard his sister cry out and call his name. Upon finding that the phone was dead, Nathan escaped through his bedroom

---

[1]When he committed the murders, DeYoung was nineteen years old, had finished high school and one year of college, and lived with his parents.

2

window . . . .

Id. at 161-62.

Instead of setting the house on fire, DeYoung and Hagerty searched for Nathan. Meanwhile, Nathan fled to his neighbor Keith Harmon's home. Nathan returned minutes later to the DeYoung house with Harmon, who brought a gun. Harmon saw DeYoung in the driveway and called out to him, but DeYoung fled. Id. at 162. Harmon had been the DeYoungs' neighbor for about five years at the time of the murders. Harmon knew DeYoung and his siblings, and Nathan was a close friend of Harmon's stepson.[2]

Police arrived and found Gary, Kathryn, and Sarah DeYoung's bodies. Sarah had scores of stab, cutting, and slash wounds on her neck, back, chest, arms, and hands. The wounds to the back of Sarah's neck overlapped so much it was impossible to count them. There were at least seventeen wounds on Sarah's back, several of which had prominent hilt marks. The blood spatter patterns indicated Sarah was on the ground while most injuries were inflicted.

Kathryn DeYoung, like Sarah, had many stab wounds and cuts on her neck, back, and torso. Among them were a seven-inch-long cutting wound on her thigh and a five-inch-deep stab wound on her back that penetrated into her chest and

---

[2]After the murders, Nathan lived with Harmon until he finished high school.

3

completely severed her aorta. One wound in her neck cut all the way through her trachea and also severed her left carotid artery and left external jugular vein. Kathryn had wounds going across her chest and wrapping around her right side, consistent with being attacked while lying down and rolling away from her attacker.

Gary DeYoung suffered numerous wounds to his face and upper torso. He had a cut over his right eyebrow ridge, a deep stab wound in front of his right ear that fractured his jaw, stab wounds in his upper arm and neck, and numerous stab wounds to his chest. Gary also had two wounds on his right thigh, a six-inch-deep wound on his back, and a large chopping-type wound on his right biceps.

**B.      The Arrests**

Several hours after the murders, DeYoung returned home. Police noticed "scratches and abrasions present on his face, neck, hands and right arm." DeYoung v. State, 493 S.E.2d at 162. At the police station, DeYoung gave a statement, later played at his trial, in which he told police he had spent the night at Hagerty's house and denied involvement in the murders. Id. DeYoung said he went for a two-hour walk in the middle of the night and got the injuries when he fell down.

The police interviewed Hagerty, who admitted participating in the crimes.

4

Hagerty led police to evidence, including a footlocker and box he had helped DeYoung hide three days earlier, a knife consistent with the victims' wounds, and a hand-drawn map showing the route to the DeYoungs' home. Id. The footlocker contained, among other things, personal notebooks written in DeYoung's handwriting, articles or books with DeYoung's name on them, and the hand-drawn map. The box contained materials for making pipe bombs.

DeYoung and Hagerty were arrested and charged with the three murders. Hagerty pled guilty and received three concurrent life sentences. DeYoung pled not guilty.

## C.     Defense Counsel

Attorneys Dennis O'Brien and Jimmy Berry were appointed to represent DeYoung. In April 1995, Jimmy Berry withdrew and the state trial court appointed Derek Jones as lead counsel, with O'Brien assisting. Both Jones and O'Brien were very experienced criminal defense attorneys.

When Jones began representing DeYoung in April 1995, Jones had been an attorney for twenty years and had tried about ten capital cases. Jones obtained an acquittal in one, and most of the others "resulted in life sentences either at a plea, after extensive litigation, or at a jury verdict."

When O'Brien was appointed to represent DeYoung, O'Brien had tried 50 to

100 felony cases, including a number of murder cases, maybe one every couple of years, and he was involved in more murder cases that did not go to trial. O'Brien tried one death penalty case before DeYoung's. During this case, O'Brien consulted with more experienced death penalty attorneys.

**D.  Pretrial Mental Health and Mitigation Investigation**

In their pretrial preparation, DeYoung's counsel consulted (1) psychiatrist Dr. Alfred Messer, (2) neuropsychologist Dr. Robert Shaffer, (3) private investigator Joseph Stellmack, and (4) death penalty mitigation specialist Pamela Blume Leonard.

Dr. Messer met with DeYoung at the jail twice. O'Brien sent Dr. Messer a number of documents, including the police report; police interviews with DeYoung, Hagerty, a former neighbor of the DeYoung family, a cellmate of DeYoung's, and Nathan's girlfriend; and transcripts from the probable cause hearing and Hagerty's guilty plea. In his December 1994 report, Dr. Messer opined that the records and psychiatric evaluations were "sufficient to make a credible clinical judgment."

Dr. Messer's report stated DeYoung was "alert, oriented, and cooperative," and described no delusions or hallucinations. DeYoung had always been a loner, had little relationship with his siblings, and tended to avoid them. DeYoung's

father gave him "very strict guidance," but DeYoung received "very little physical discipline." DeYoung tried to listen to his parents, who were the "most intellectual people [he] ever met," and "always tried to make sure what [he] did would get [his] father's o.k." But DeYoung differed sharply with his parents on church attendance. His parents insisted the family attend church together, but DeYoung "became interested in occult matters and had books on Satanism." DeYoung indicated his occult interest "was just curiosity" and "didn't take me off course."

DeYoung wanted to develop a business career that would earn him enough money to become "independent of people." He had an idea for an entertainment complex and tried to raise money for it, but "[b]y the time [he] could get something organized, somebody else stole the idea." DeYoung was "very cynical about people, particularly authorities and police" and had "little trust that things will work out for him."

Dr. Messer diagnosed DeYoung with "[a]djustment [d]isorder with [w]ithdrawal," but found "no evidence of psychosis, manic depressive illness or drug intoxication." Dr. Messer also diagnosed DeYoung with "[b]orderline personality disorder . . . , severe, manifested by chronic feelings of emptiness, boredom, and failure." Dr. Messer concluded that DeYoung suffered from "uncertainty and shifting ideals about long-term goals and career," a "need to be in

control," and "chronic irritability." DeYoung demonstrated a "[p]ersistent pattern of unstable interpersonal relationships with overidealization or devaluation or cynical beliefs that people cannot be trusted, that they have stolen his ideas."

Dr. Messer found "[n]o significant physical problems," but that DeYoung had psychosocial stressors "related to an adolescent consolidating his identity and the need to achieve according to standards set by highly demanding parents." Dr. Messer's 1994 report pointed out that DeYoung denied involvement in the murders and was completely able to help counsel at trial:

> Here is a man who steadfastly denies involvement in the murder of his parents and sister. There has always been a degree of power struggle with his parents about his ability to measure up to their standards. There is no long history of violence in this man. . . .
> The patient is completely able to cooperate with [counsel] in marshalling an appropriate defense at trial. I do not see psychiatric factors as part of his defense.
> Dr. Messer met with attorneys Berry and O'Brien, and they "discussed the

need to present psychological evidence in mitigation, to try to explain the killings." Dr. Messer and the attorneys "agreed it was important to tell the jury in the penalty phase about the crime of parricide generally, and the specific indications in Mr. DeYoung's background and manner which fit the profile of a child who commits that crime." Dr. Messer was "prepared to testify regarding parricide and [Dr. Messer's] observations of [DeYoung] and his family in this regard."

During this pretrial phase, Dr. Shaffer performed an 11-and-1/2 hour

8

neuropsychological evaluation of DeYoung. Dr. Shaffer reviewed DeYoung's high school and college records, plus a list of the items taken from DeYoung's footlocker. Dr. Shaffer's evaluation showed DeYoung had (1) an IQ of about 140, (2) an acute awareness of his intellectual abilities, and (3) no evidence of brain damage. DeYoung told Dr. Shaffer that his father "was of equally superior intellectual ability" and was one of the few people to whom DeYoung could relate, and that DeYoung and his father "competed intellectually." DeYoung's parents "were unquestioningly religious, and their unwavering acceptance of church dogma had caused [DeYoung] to seek out and explore as many different philosophies and religions as he could in a search for answers."

Dr. Shaffer found DeYoung had "a lack of empathy and emotional bluntness, as well as a very active fantasy life." Dr. Shaffer diagnosed DeYoung with "Narcissistic Personality Disorder with symptoms of grandiosity." Dr. Shaffer told DeYoung's attorneys there "was evidence of some borderline psychotic symptoms, and possible schizoid tendencies," but Dr. Shaffer "did not have enough information to make that diagnosis with a reasonable degree of professional certainty."[3]

---

[3]Dr. Shaffer asked to speak with Nathan DeYoung. A memo from Leonard, the mitigation specialist, states:
> [Dr. Shaffer] agrees that deeper digging is necessary and he'd like to meet with the brother, Nathan. However, Derek Jones tried to squelch that idea because it would

Investigator Stellmack spent about 260 hours working on the DeYoung guilt-phase and penalty-phase investigation. Stellmack compiled a list of potential mitigation witnesses, starting with those persons DeYoung suggested the attorneys contact, and added people or information to the list as he or the attorneys learned about them.[4] Someone from the defense team tried to contact everyone on the list. The list described the attempts to contact the persons, plus a brief summary of the information the witnesses provided. For certain witnesses, Stellmack created more detailed interview notes.

On April 3-11, 1995, investigator Stellmack interviewed DeYoung's college teachers, assisted on an interview with Audrey Fridsma (the maternal grandmother), and conducted a telephone interview of Letha DeYoung (the paternal grandmother). On April 14, 1995, Stellmack met with O'Brien, Jones,

---

alert the family that "we are trying to trash the parents" and he is holding on to the grandparents as mercy mitigation witnesses.

Leonard's memo went on to say that Dr. Shaffer "found no indications of any neurological problems" and "saw no indication of serious personality disorder or mental illness."

[4]The list of potential mitigation witnesses contained the following 45 names: DeYoung's relatives Marvin and Letha DeYoung, William and Audrey Fridsma, Nathan DeYoung, Phillip and Brenda Veen, Susan Fridsma, John and Effie Vanderbilt, Karen Bielfuss, and Laura DeYoung; DeYoung's fellow church members Rev. Chris Devos, Melissa Oezer, Clarence DeYoung, Cindy Verhage, Bert VanWyk, and Steve and Leslie Ruiter; DeYoung's co-workers Kathy Albright, Beth Fisher, Judy Stevens, Barbara Grim, Jennifer Layton, Christin Edwards, and Sharon Koontz; DeYoung's friends Kim Earlywine and Diane Butler; DeYoung's neighbors Judy Polver Coffey, Cindy Etheridge, and Keith Harmon; DeYoung's college professors Alan Lowther, Dr. Martha Myers, Martha Boyd, Dr. Charles Setzer, James Richardson, Dr. Philip Secrist, Brit Povlson, Steven Smalt, Merle King, Faye Jenson, and Dr. David Morgan; and DeYoung's high school teachers Captain Csintyan, Velma Laughlin, and Bob Starrett.

10

Leonard, and Dr. Shaffer to discuss mitigation issues.

Stellmack also contacted DeYoung's maternal and paternal grandparents about testifying in the penalty phase. Stellmack described them as "reluctant." Stellmack stated that "[n]one of [the grandparents] were certain of attending the trial or testifying [as of April 1995], and I felt strongly that we needed to get them on board to the extent we could."[5]

Stellmack tried to ask Nathan DeYoung to testify in mitigation. Nathan was living with Harmon, who would not let Stellmack talk to Nathan. Later, Nathan left Harmon's house and lived with his girlfriend; Stellmack tried again to contact Nathan. Stellmack got Nathan's telephone number from his grandparents and tried to call Nathan "regularly," "on an average three times a day." Stellmack spoke to Nathan's girlfriend several times and tried to explain to her "what the penalty phase was about and stressed to her that at some point in the future Nathan might want Andy to be alive." Nathan's girlfriend told Stellmack that Nathan "had no interest in testifying." As of May 1995, Stellmack was only getting Nathan's answering machine. Nathan never returned Stellmack's calls.

Investigator Stellmack tried to subpoena some of the Burger King co-

---

[5]In May 1995, Stellmack told O'Brien he should inform DeYoung that "no one is exactly jumping at the idea of testifying on his behalf." Stellmack confirmed in his state habeas testimony that he had difficulty finding people to testify for DeYoung.

workers DeYoung named as possible mitigation witnesses. When Stellmack went to Burger King to interview DeYoung's co-workers, the manager asked him to leave. Burger King instructed its employees to notify its legal department if the employees were interviewed or subpoenaed. Stellmack spoke with DeYoung's co-worker Kathy Albright at her home. The other employees Stellmack contacted told him they were not going to speak with him.

In September 1995, Stellmack tried to locate Kim Earlywine and spoke to DeYoung family friend Diane Butler. Stellmack interviewed DeYoung's minister[6] and the ROTC instructor at DeYoung's high school and re-interviewed neighbor Judy Polver Coffey. Stellmack subpoenaed DeYoung's school and work records.

The defense attorneys considered calling Diane Butler to testify, but Jones decided not to use her as a witness. Jones had a "specific reason," but Stellmack did not remember what it was. Jones and O'Brien also considered calling Leonard as a witness, but ultimately she was not called.

In September 1995, Stellmack called the grandparents to firm up their travel arrangements. Stellmack and O'Brien met and spoke to DeYoung's paternal grandparents, Marvin and Letha DeYoung, before trial began.

---

[6]DeYoung's minister, Chris Devos, was "hesitant to discuss a lot of details" and told Stellmack only "what you would expect from a pastor": the DeYoungs "attended his church, they came to church on a regular basis, they seemed like a nice family."

After Jones was appointed as lead counsel, Jones took "the main responsibility for [the] penalty phase," and "insist[ed] on concentrating on the grandparents as mitigation witnesses." Attorney Jones met with DeYoung about ten times before trial. Jones spoke with DeYoung's grandparents, an uncle, some aunts, and other family members who lived across the United States and overseas. Jones's strategy was to "rely on residual [doubt] . . . [and] the testimony of the family members in the sentencing." Jones discussed this strategy with DeYoung, and DeYoung agreed with it. As to residual doubt, Jones tried to portray Hagerty, who was several years older than DeYoung, as the one "calling the shots."

Before Jones was appointed, DeYoung's counsel considered having Dr. Messer testify in the penalty phase as to parricide and the DeYoung family's internal dynamics. In an April 1995 colloquy with the state trial court, Berry explained the testimony the defense team was contemplating for Dr. Messer:

> Dr. Messer has done some extensive reading in [the parricide] area, and is knowledgeable about what happens sometimes in families, and especially after talking with Mr. DeYoung, and looking at the evidence in the case, with relationship to how this family unit worked, and what happened in this family unit, what transpired, and what the members of this family unit did as a family, and didn't do as a family. All of these things he would be rendering an opinion about what . . . may have happened in this family. What may have triggered this kind of a scenario.
> . . .
> And what we would attempt to do would be to have Dr. Messer explain what other factors may have prompted [DeYoung's] conduct,

13

. . . as opposed to money. . . . It involves the dynamics of the family, the relationship with the father, these are the kinds of things that historically he has found in these kinds of cases, things like that.

Counsel also considered retaining a parricide expert from California.

In May 1995, after Berry withdrew and Jones was appointed, O'Brien and Jones explained to the state trial court that they had made a strategy decision not to use the California parricide expert. Jones stated that he and O'Brien were "still grappling" with the idea of presenting "some sort of psychological explanation," but that "if all this psychological testing . . . comes to no fruition, then, you know, we're obviously not going to put it up in any phase." Counsel explained they would decide after discussing the matter with Dr. Messer and Dr. Shaffer:

| | |
|---|---|
| Mr. O'Brien: | What we think will probably happen . . . is to get Dr. [Shaffer] and his findings, conclusions with Dr. Messer. . . . [T]o sit down, let them compare notes, talk to us so that if there comes a point in time when and if the jury ever decides guilt, I would assume, and Derek the same, I assume, that the jury is going to want to know, how did this happen? And we were thinking that we would like to be able to explain it psychologically, at least give them that explanation. I mean, that's what – |
| Mr. Jones: | If there is one. |
| Mr. O'Brien: | If there is one. |
| Mr. Jones: | And, quite frankly, even if there is, you know, Dennis and I may look at it and say, well, you know, we might accept that but would a jury? And just jettison it. |

Later, Jones and O'Brien met with Dr. Messer and Dr. Shaffer and decided

14

not to present mental health evidence at the penalty phase because it was not helpful.[7] Jones believed he and O'Brien researched the mental health area thoroughly. Jones stated, "[W]e consulted with experts, and experts did some evaluations, and it was not helpful."

The defense team collected information about parricide cases.[8] But Jones, a very experienced criminal defense attorney, "didn't put much stock in the psychiatric angle, and he pushed to rely on having family members plead for mercy in the penalty phase." Moreover, the defense team's jury consultant Maureen McGinley warned attorneys Jones and O'Brien that it would be a bad idea "to show disrespect for dead people in court" by presenting evidence tending to malign the victims, and that if there was sufficient evidence to allow the jury to infer something inappropriate occurred within the DeYoung family that prompted DeYoung to commit the murders, the attorneys should "leave it hanging and let the jury make [the inference] on their own."

_____

[7]A memorandum from this meeting contains the following notations:
No delusional comp[ulsion] or irresistible impulse[.]
No psychiatric defense!" . . .
I am annihilated or I'll annihilate them.
Sh - People who perform parricide are not particularly violent - nor do they murder again.
No remorse. No normal grief reaction.

[8]Leonard, the mitigation specialist, provided counsel with a list of documentary evidence to collect. Leonard suggested that parricide was a crime that "necessarily suggested an abuse situation."

As to non-mental health mitigation, Jones and O'Brien considered calling a number of witnesses that they ultimately did not call. Jones and O'Brien did not call them because counsel did not believe they would be helpful:

> [W]e thought that the family members would be the most effective. And there was other people – there was people who may have testified. We had other people under subpoena, other people available, but we felt at the time that they would not be helpful.

Some of the potential witnesses had information that would have been harmful. For example, DeYoung's former girlfriend Daphne Collins said that DeYoung told her he hated his parents and wanted them dead. And DeYoung's former best friend Cooper Etheridge said he was unsurprised that DeYoung killed his parents because DeYoung told Etheridge that he wanted to kill his parents and, in fact, had said "he wanted to kill everybody."

Jones thought the testimony of DeYoung's family members, who were also related to the victims, was compelling. Jones did not know what else he could have presented that would have been as good as the family's testimony:

> You know, when you have got the family of the victims, which I have never had one before where the family of the victims were also kin to the defendant, but when you have those people coming in and asking the jury to spare their grandson's life, I don't know how much more compelling mitigation evidence you can get.
>
> I mean, I thought their – I thought they had a lot to say to the jury, and I don't know what else we could have presented, you know, that would have been as good as that.
>
> I mean, there was nothing that I think that I could have

16

presented that I didn't that would have been helpful.

    I mean, I don't really feel that I left, you know, a three hundred hitter, so to speak, sitting on the bench and didn't call him to pinch-hit. I think we went with what we thought would work at the time.

Although Jones was more involved in the mitigation phase than O'Brien was, O'Brien talked to many potential witnesses. O'Brien talked with a number of DeYoung's teachers, including his college professors, but no one at the college said anything O'Brien or Jones thought would help. O'Brien also spoke to DeYoung's high school teachers and fellow students.

The defense team interviewed some of DeYoung's Burger King co-workers. In particular, they investigated a co-worker named Jojo Moore, who other employees claimed dabbled in the occult. O'Brien and Jones "thought that perhaps maybe [Moore] had had some influence on [DeYoung], and we pursued that a little bit. That didn't go anywhere." O'Brien and Jones discovered that "there was some evidence . . . [that DeYoung] was selling pot out of the back of the Burger King." The attorneys were hesitant to call co-workers who might know about that.

Attorney O'Brien spoke with DeYoung more than twenty times before trial. O'Brien also spoke with Nathan DeYoung and his girlfriend.[9] O'Brien spoke with

_____

[9]O'Brien told the state trial court at a May 1995 pretrial hearing:
We're trying to get [Nathan and his girlfriend Jennifer Dunlea] interested. But he will not cooperate at this point. We have asked him if he will come to my office, and Jennifer. If they will let the doctor talk to them. Maybe. We're not sure. We're going to think about it, you know. I mean, we can't force them to do it but we're moving forward in any event.

17

DeYoung's grandparents and uncles and aunts.  When DeYoung's family members came to the DeYoung house to take care of matters involving Gary and Kathryn's estate, O'Brien interviewed them, got their addresses, and stayed in touch.  O'Brien and Jones realized that DeYoung's grandparents "would be very significant in [the] case," so O'Brien and Jones "started courting them right from the conceptual stages of the case."  Attorney O'Brien talked with the grandparents on the phone and went to see them in Iowa.  At a December 1993 hearing, O'Brien told the state trial court he had traveled to Iowa, Ohio, and Michigan to meet with members of DeYoung's extended family.

## E.    The Penalty Phase

DeYoung's trial started on September 25, 1995.  DeYoung was convicted on all three counts of murder.  The State then called penalty-phase witnesses to testify about burglaries at the DeYoungs' church, at a DeYoung neighbor's home, and at two Burger King restaurants where DeYoung worked.  Items stolen were found in DeYoung's room and in a storage bin DeYoung rented.  The police found materials for designing and making pipe bombs in the DeYoungs' garage, in DeYoung's room and van, and in the box that was hidden with the footlocker.

---

O'Brien told the state trial court that the defense team may not be able to get Nathan to testify, but "we have kind of laid it on the table to him, where we are.  He knows what is going on."  O'Brien reiterated, "[W]e're trying to get the brother involved in a positive way.  We haven't done it yet.  We may never."

18

The defense called five penalty-phase witnesses. Audrey Fridsma, DeYoung's maternal grandmother, testified she was conflicted because three of her family members were killed by another family member. Fridsma testified, "Andy has to pay for what he did to our daughter and family, and so one side of me says, considering the terrible nature of this crime, that the death penalty would be [an] appropriate measure of justice." But on the other side, Fridsma did know how she could live with herself if she asked, "even in the name of justice, to put [her] grandson to death." Fridsma told the jury she "would lean towards life in prison without parole," because she "would like the opportunity to be able to forgive my grandson, even if I don't feel like forgiving him right now." A life sentence would give her that chance, but more importantly, would give DeYoung the opportunity to consider what he had done and ask for forgiveness from his family and from God.

Robert Ohberg was DeYoung's high school chemistry teacher. DeYoung was a good student who kept to himself and did not interact much with other students, though he got along with his lab partners well enough. DeYoung had no discipline problems, had a good sense of humor, and was "friendly enough if you initiated a conversation." DeYoung never demonstrated any hostility, but was very somber and serious, and he rarely smiled.

DeYoung's paternal grandmother Letha DeYoung testified that she and her husband visited DeYoung's family about every two years, for three or four days at a time. DeYoung and his family got along fine, and DeYoung was respectful of his parents. Letha DeYoung corresponded regularly with DeYoung in jail and visited him twice. DeYoung wrote to his grandmother that he "was helping some inmates with GED tests, or with writing letters." DeYoung wrote about his family, sent Letha DeYoung a poem about Gary DeYoung,[10] and sent Nathan a birthday card and a graduation note.

Letha DeYoung asked the jury for mercy for DeYoung, for "life not death." Letha DeYoung said that "[o]ne of [her] reasons for asking [for a life sentence] is that God did not kill King David after David plotted the death of Uriah," and she read that Bible passage to the jury. Letha DeYoung showed the jury childhood pictures of DeYoung. She testified about her memories of DeYoung and his personal characteristics as he grew up:

---

[10]Letha DeYoung read DeYoung's poem about his father:
I had a father who talked with me, allowed me the right to disagree,
to question and always answered me as well as he could and truthfully.
He talked of adventures; horrors of war; of life, its meaning; what love was for;
how each should always want to strive to improve the world to keep it alive.
Stressed the duty we owe one another, to be aware each man is a brother.
Words for laughter he also spoke a silly poem or a happy joke.
Time goes on, some say I'm wise that I look at life with seeing eyes.
My heart is open, my mind is free, I had a father who talked with me.

I have happy memories of Andy. He was always pleasant. He was cooperative. He was friendly. He was willing to talk. He is verbal. Most of those memories are, of course, from before the teens, or early teens.

I don't know what Andy was like in his home after he became involved in Satanism. Satanism does something to a person.

One thing you have to break all ten commandments, and one of the commandments is honor your father and mother.

I do not know what he was like, because the last time we visited in his home, he was 16.

Did I notice anything unusual? I didn't. If he was disrespectful it is nothing [that] is registering in my memory. I will remember something that stands out.

I do remember, and kind of hate to say this, but I do remember one time when he was disrespectful. But it was – it was at a family reunion. He was 18. It was 1992. I hate to say this, but I just want you to know I don't think Andy would have done – and it wasn't that bad – been rude if he had not been under the influence of Satanism. I knew he was under its influence.

Q.     Miss DeYoung.

A.     I want to tell you about this incident.

Q.     Is it a fair statement that you think that if Andy did this it was because of the powers of evil?

A.     I think it is fair, yes. This is an incident I'm going to tell you about.

Mr. Jones:   Ma'am, I have no further questions.

The Witness:   Do you want me to talk, or do you want me to wait?

Mr. Jones:   No, ma'am.

On cross-examination, the State asked Letha DeYoung to continue:

I am just trying to be honest.

As I told you, I have very happy memories of Andy except this one incident at 18, and he was under the influence of Satanism at the time.

They were all ready to go. They were in our driveway.

We were going to say goodbye, and we were all standing around, his mom and his dad, and my husband and I, and I think an

21

uncle and aunt, and I suppose cousins.

Anyway, I don't know. I guess his mother moved something. They were – she opened the back of the van, and she moved something that he had nicely put in place, and he was – he got irritable about it, and to be honest, I was embarrassed.

Gary was embarrassed. His mom didn't know what to say.

But not one of us adults – I'm going to take the responsibility – not one of us adults corrected him.

Now, it is possible that Gary corrected him as soon as they were out of sight of us, you understand.

But that is the only time that I can remember Andy being rude ever.

I told you my memories are happy of him, and that didn't surprise me. I can tell you exactly what went through my mind at that time. It's because he is under the influence of Satanism.

It does you no good, ever. But that's my only time.

On redirect, Letha DeYoung said she loved DeYoung and would continue writing to him. She testified that, "[e]xcept for the grace of God, it could be any one of us" because "Satan doesn't come to one and not to the other[,] [although] I'm not saying that he will come to everyone." Letha DeYoung did not know when DeYoung got into Satanism, but she guessed it was when he was fourteen. Defense counsel said he had no more questions. Letha DeYoung asked to show the jury other pictures, because she "wanted [the jurors] to see the difference in Andy after he was into Satanism." She showed the pictures, and then made a final plea for life instead of death:

I would like to have life for Andy instead of death for the sake of his brother.

I don't think Nathan, his brother, came this morning. His

22

brother is very quiet.  Just has difficulty being in front of people.

It's the only family member that Nathan has left.  For that matter, if you take Andy's life, it will be – Nathan will be the only family member we have left.

I do want you to think carefully.  I was hoping that the State would use Andy's services.  I think you know he is gifted academically.  He would have to give his services without remuneration.

But he is very good in computer programming.  Also at one time he was good in the sciences, and I don't know if he could be educated so he could take part in research, find a cure for cancer, any other disease.  There are so many that have to be cured.  I don't know.  But it is a reason that I would like to have Andy have life instead of death.

Judith Coffey was a neighbor of the DeYoungs.  Coffey's daughter Amber was the same age as DeYoung, and the two were best friends from about age nine to thirteen or fourteen.  Amber and DeYoung both loved animals, and they took care of animals together.  They once found a baby squirrel that was hurt, and they tried to save it.  Amber and DeYoung played at the creek: fishing, playing in the sand, catching salamanders and lizards and snakes.  DeYoung treated the animals very well and "would never hurt anybody or anything.  He was very, very compassionate."  Coffey never saw any cruelty in DeYoung, and one time when Nathan crushed a bug, DeYoung ran out and told him not to do that because "[t]hat's Amber's friend."  DeYoung and Amber got upset when Coffey's son killed bees.

DeYoung got along fine with his family as far as Coffey knew.  Coffey saw

23

no arguments or fights, or "any discontent at all." DeYoung was "always very respectful" of his parents, "always said, yes, sir [or] no, sir," and "just seemed very polite, and very kind." DeYoung was not aggressive with the other neighborhood children. Most of the time, "if there was going to be a confrontation, [DeYoung] and Amber would leave. . . . They didn't seem to want to get into arguments, or fights, or anything. They seemed to shy away from them. I never saw any aggression at all." Coffey "never saw . . . anything but congeniality."

On cross-examination, Coffey testified that DeYoung and Amber "drifted apart," and DeYoung "got another crowd of kids to go around with," including Cooper Etheridge and Wilbur Call. DeYoung, Etheridge, and Call went into Coffey's house when Coffey's garage was open and stole food from her refrigerator. After Coffey confronted the parents, Gary and Andrew DeYoung came to Coffey's house and DeYoung apologized. Afterward, DeYoung returned on his own, apologized again, and said he should have stopped the others because what they had done was not right.

DeYoung's paternal grandfather, Dr. Marvin DeYoung, testified that, for a number of reasons, he was <u>against</u> giving DeYoung a death sentence:

> Now, when it comes to sentencing, I think there are some things I would like to say.
> In the first place, I'm not in favor of the death sentence for Andy that's for sure.

24

Now, they are selfish reasons, of course. He is my grandson. I don't want to see him put to death. But I think there are a lot of other reasons, too, why I say that.

Andy is a different boy than the average – I use the term loosely – prisoner.

Andy has a good mind. He has been raised in a Christian church. He has gone to Christian school, and he has been baptized. And baptism means that that's God's mark on him. And when God marks somebody that means something to God, and God doesn't forget that.

Dr. DeYoung testified that a life sentence would be better than death because DeYoung could "become a real useful servant of God":

[M]y plea for Andrew, for the jury, would be that if you give Andrew life in prison rather than death[,] I can see that he can become a real useful servant of God . . . .

[The penal system] can be changed by somebody like Andrew, if he gives his life to Christ. He can become a real witness for the good news of salvation.

Dr. DeYoung also testified that, although DeYoung had helped some people in the jail get their GEDs, he could do even better by bringing people to Christ. After presenting its witnesses, the defense put into evidence copies of DeYoung's college and grade-school records, and payroll records showing DeYoung was employed from June 1, 1989 to June 24, 1993.

The jury returned verdicts of death on all three counts. The jury found three statutory aggravating circumstances: (1) the murders occurred while DeYoung was committing another capital felony; (2) the murders were committed for money or

25

things of monetary value; and (3) the murders were outrageously or wantonly vile, horrible, or inhuman in that they involved depravity of mind and aggravated battery to the victims before their deaths. The state trial court imposed death sentences on all three counts.

## F. Hearing on Motion for New Trial

After trial, DeYoung received new counsel, Edwin Wilson, who had practiced law since 1977, had been a prosecutor, and had a general practice, including criminal defense.[11] Wilson spent 77 hours reading the trial transcript and probably read it more than once. Wilson stated that "[t]he transcript looked pretty thorough to me." He reviewed DeYoung's trial counsel's files, which were nearly 12,000 pages.

Wilson spoke with DeYoung and discerned potential issues from his transcript review. DeYoung was concerned counsel had not presented testimony from his co-workers. Wilson and DeYoung corresponded often, but DeYoung never mentioned any dysfunction within his family. Wilson spoke with attorneys Jones and O'Brien, the DeYoungs' minister, and DeYoung's grandmother. Wilson was familiar with presenting ineffective assistance of counsel claims, and he

---

[11]Wilson represented DeYoung both in the motion for new trial proceedings before the state trial court and in his direct appeal. For brevity's sake, we refer to Wilson simply as DeYoung's appellate counsel.

intended to raise everything that appeared to be possible error, including any trial counsel performance issues.

Through Wilson, DeYoung filed a motion for new trial alleging, inter alia, that his trial counsel were ineffective because they: (1) failed to develop and present psychological evidence in the penalty phase; and (2) failed to develop and present other available mitigation evidence in the penalty phase. The state trial court held an evidentiary hearing.

Trial counsel Jones and O'Brien testified about their mitigation investigation and strategy, which is already outlined above. DeYoung gave Jones and O'Brien a list of at least twenty potential mitigation witnesses, including Kathy Albright, Kim Earlywine, and Judy Stevens, and DeYoung later submitted affidavits from Albright, Diane Butler, and Beth Fisher. Albright, a fellow manager at Burger King, stated that DeYoung "handled his authority well" at Burger King and had no problems relating to fellow employees or customers. DeYoung was quiet, did not have a lot of friends, and made no real attempt to associate with the other employees. DeYoung often "conveyed . . . his desire to go beyond Burger King to what he perceived as something better." Overall, DeYoung "was a good kid who seemed to know what he wanted out of life . . . [and] had the intelligence to achieve it." DeYoung "appeared to have the potential to be a contributing and

27

successful member of society."

Butler, who attended DeYoung's church, stated that DeYoung "had a brilliant mind" but lacked "simple social skills" and had trouble relating to and interacting with others. Butler developed a friendship with DeYoung by visiting him in jail while he awaited trial.

Fisher, another co-worker, stated that DeYoung handled his managerial position well, "got along well with the crew and customers," and "never posed any problems." DeYoung visited Fisher's house on several occasions and played with Fisher's children. Fisher trusted DeYoung and found him to be pleasant and "a good kid." DeYoung often discussed plans to open his own Burger King or a teen club. DeYoung had intelligence and common sense and was "a high achiever with a lot of potential."

The state trial court denied DeYoung's motion for new trial. As to DeYoung's mitigation evidence claims, the state trial court found: (1) DeYoung was able to assist his attorneys in preparing for trial; (2) Dr. Messer did not see psychiatric factors as part of his defense; and (3) Dr. Shaffer's extensive testing and Dr. Messer's consultations produced no "useable psychological evidence for the defense." The court found that the affidavits of Albright, Butler, and Fisher indicated their testimony would have been similar to that already presented by

28

counsel in the penalty phase and would not have changed the outcome:

> A review of the affidavits of Diane Butler, Kathy Albright, and Beth Fisher, submitted to supplement the record, indicates their relationship as church members and/or as fellow workers of DeYoung and their observations of him as intelligent, a good worker, and pleasant to be around, and of his hopes to improve his position in life. Similar testimony was presented at trial through a former teacher, a former neighbor, and three of DeYoung's grandparents. In view of the strong evidence connecting DeYoung to the murders of his parents and his sister, it is unlikely this cumulative evidence, if presented, would have changed the outcome of the trial.

## G. Direct Appeal

DeYoung, through counsel Wilson, appealed, claiming he had ineffective trial counsel for failure to call Butler, Albright, and Fisher as witnesses in the penalty phase. The Georgia Supreme Court affirmed. DeYoung v. State, 493 S.E.2d 157 (Ga. 1997). On direct appeal Wilson did not include a claim of ineffective trial counsel for failure to investigate and introduce pyschological or any other mental health evidence.

The Georgia Supreme Court found no error in the state trial court's conclusion that DeYoung did not show ineffective counsel at the penalty phase from not calling Butler, Albright, and Fisher:

> [T]rial counsel extensively investigated DeYoung's background, interviewing his teachers, other students at his school, co-workers, friends and family members. DeYoung was examined by both a psychologist and a psychiatrist and the defense presented mitigation testimony from a former teacher, a former neighbor, and appellant's

29

grandparents. Counsel elected not to offer Butler, Albright, and Fisher as mitigation witnesses since their testimony would have been cumulative.

Decisions regarding which witnesses to present are matters of trial strategy. When founded on legitimate evidentiary concerns, such decisions do not constitute ineffective assistance of counsel. The affidavits submitted at the motion for new trial reveal that Albright and Fisher were appellant's co-workers at Burger King. The trial court noted in its order denying the motion for new trial that the affidavits of these witnesses demonstrated that DeYoung was "intelligent, a good worker, and pleasant to be around, and [had] hopes to improve his position in life," and their testimony would have been similar to that presented by the witnesses who did testify.

We conclude that none of the enumerated actions or omissions by counsel constitute ineffective assistance of counsel.

Id. at 164-65 (citation omitted). The United States Supreme Court denied DeYoung's petition for certiorari. DeYoung v. Georgia, 523 U.S. 1141, 118 S. Ct. 1848 (1998).

## H.    State Habeas Proceedings

DeYoung through new counsel petitioned for a writ of habeas corpus in state court.[12] He claimed, inter alia, that Wilson was ineffective for not raising and proving more claims in his motion for new trial and direct appeal, especially the claim that his trial counsel were ineffective in their investigation and presentation of mitigation evidence. The state habeas court held an evidentiary hearing.

_____

[12]During the state and federal habeas proceedings, DeYoung was represented by his present counsel. In the context of DeYoung's state habeas proceedings, we refer to the state trial-level court as the "state habeas court." The judge who presided over DeYoung's state habeas proceedings was not the same judge who presided over DeYoung's trial.

30

DeYoung introduced documentary evidence and more than 90 affidavits as evidence of what appellate counsel Wilson and trial counsel Jones and O'Brien could have developed as mitigation evidence.[13]  We summarize the pertinent evidence.

### 1. DeYoung's New Mental Health Evidence

DeYoung's new mental health evidence mainly focused on showing that, with more evidence, his diagnosis was "schizotypal" personality disorder and dysthymia rather than his pretrial experts' diagnoses of narcissistic personality disorder and borderline personality disorder.  Dr. Faye Sultan, a psychologist, interviewed DeYoung in prison and reviewed trial excerpts and 62 affidavits about DeYoung and his family.  Dr. Sultan diagnosed DeYoung with (1) dysthymic disorder, indicating he "experience[d] chronically depressed mood," loss of interest in life, decreased capacity to experience pleasure, social withdrawal, and feelings of inadequacy, irritability, and excessive anger; and (2) schizotypal personality disorder, indicating he suffered "a pervasive pattern of social and interpersonal deficits marked by acute discomfort with and reduced capacity for close

---

[13]Wilson, as DeYoung's attorney, did not raise ineffectiveness claims regarding mental health evidence on direct appeal or regarding other mitigation evidence (apart from the Butler, Albright, and Fisher claim) either in the motion for new trial or on direct appeal.  Therefore, DeYoung had to raise those claims through the lens of Wilson's alleged ineffectiveness for failing to raise them either in the motion for new trial or on direct appeal.

31

relationships, cognitive and perceptual distortions, and eccentricities of behavior."[14] Dr. Sultan opined that these disorders (1) "severely compromised Mr. DeYoung's capacity to think clearly and to handle normal life stressors, to regulate his behavior, and to meet the requirements of daily living"; and (2) "rendered him extraordinarily vulnerable in interactions with individuals who were authoritarian, exploitative and manipulative in their manner of relating," such as David Hagerty.

DeYoung's state habeas counsel provided Dr. Messer and Dr. Shaffer with more records and information about DeYoung and his family. With this new information, both Dr. Messer and Dr. Shaffer concluded that "schizotypal personality [disorder] is the more appropriate diagnosis" for DeYoung. Dr. Messer opined that a diagnosis of dysthymia (a mood disorder) and schizotypal personality disorder "is entirely consistent with what I observed in Mr. DeYoung in 1994 and chronicled in my psychiatric report to [trial counsel] Mr. O'Brien." However, "[n]either diagnosis suggests . . . psychosis." Dr. Shaffer also testified that his "initial diagnosis of Narcissistic Personality Disorder was made based on Andrew's suspiciousness, social withdrawal and alienation, and apparent grandiosity." Dr. Shaffer added that, "[i]nterpreting these features now in light of . . . Andrew's history and familial background, I find that Schizotypal Personality

---

[14]No one, however, diagnosed DeYoung as having schizophrenia (a psychosis) or any other psychosis.

32

Disorder is an appropriate diagnosis."

Dr. David Lisak, a clinical psychologist, never saw DeYoung but opined by affidavit that "there was substantial information available between 1993 and 1995 that incest might have occurred in the DeYoung family, and that Andrew DeYoung himself may have been victimized."[15] However, Dr. Lisak cited no evidence from DeYoung, his only surviving sibling Nathan, or anyone else stating that sexual abuse actually occurred to DeYoung or his siblings.

2.    Nathan DeYoung's Affidavit

In an affidavit, Nathan DeYoung stated he was not asked to testify in the penalty phase. Nathan said that giving penalty-phase testimony "would have been extremely difficult for me to do," but "if I had been asked to do it, I would have said that I preferred the option of life without parole." Nathan never mentioned any possible abuse within the DeYoung family. Nathan did not dispute

---

[15]The information Dr. Lisak relied on for this "might have" happened opinion was: (1) parricide is a rare crime, and often the child-murderer was the victim of intra-family abuse; (2) DeYoung's parents and sister were stabbed two to three dozen times each, demonstrating "extreme rage or hatred"; (3) DeYoung had "withdrawn behavior"; (4) Marvin DeYoung (the grandfather) sexually abused two grandchildren and "made a sexual overture" toward his daughter; (5) acquaintances of DeYoung's family noted Gary and Sarah DeYoung were "always holding hands" and "always together," and Sarah "drape[d] herself all over her father until she seemed much too old to do so"; (6) DeYoung once told an acquaintance "that he wished someone would take him away from his family because 'his dad did stuff to them that he didn't like'"; and (7) witnesses reported "numerous oddities of the DeYoung family," including a cluttered home, an "extremely socially dysfunctional" manner, and "no physical affection or emotional closeness" other than between Gary and Sarah.

investigator Stellmack's testimony that Stellmack spoke with Nathan's girlfriend and repeatedly left messages for Nathan and that Nathan did not return his calls.

### 3. The State's Mental Health Expert, Dr. Thomas Sachy

The State presented evidence that DeYoung did not have either dysthymia or schizotypal personality disorder. For example, after reviewing the same affidavits and records about DeYoung and his family, forensic neuropsychiatrist Dr. Thomas Sachy conducted a three-hour, in-person neuropsychiatric evaluation of DeYoung in April 2001. Dr. Sachy found "no gross evidence of cognitive dysfunction consistent with a Schizophreniform disorder." Dr. Sachy saw no psychotic symptoms and found that DeYoung's "thought processes were linear and goal directed throughout the interview." DeYoung displayed no evidence of "odd or magical thinking, unusual perceptions, suspiciousness or inappropriate affect/behavior." DeYoung's reported leisure activities in prison demonstrated a "level of social interaction uncharacteristic of Schizotypal [Personality Disorder]." Importantly, DeYoung also denied any symptoms of depression and demonstrated no evidence of clinically significant depression. DeYoung said he missed his parents.[16]

Dr. Sachy also stressed that DeYoung "did demonstrate signs of malingering

---

[16]DeYoung said his father "whupped him once or twice for some minor infraction, but . . . didn't say that he was ever physically abused by his father."

34

behavior which only casts doubt upon the previous findings of Dr. Sultan."[17]  Dr.

Sachy concluded DeYoung was "in constant control of his behavior," as evidenced

by his "meticulous planning" of the murders.  DeYoung had "no documented

history of . . . a psychiatric diagnosis" before the murders.  Dr. Sachy expressly

opined that DeYoung did not have either dysthymia or schizotypal personality

disorder.[18]

## I.      State Habeas Court Order

The state habeas court denied DeYoung's habeas petition. The state habeas

court (1) summarily denied all claims that already had been decided on direct

appeal, noting it had no authority to revisit those issues, (2) determined that

---

[17]Dr. Sachy also disagreed with Dr. Sultan's conclusion that DeYoung was
"extraordinarily vulnerable in interactions with individuals who were authoritarian, exploitative
and manipulative."  Dr. Sachy found no evidence of this in the record and, indeed found contrary
evidence in DeYoung's correspondence with his attorneys, in which he requested documents or
directed the attorneys to take certain actions or make certain investigations; in DeYoung's
imperviousness to manipulation by police officers; and in DeYoung's leadership role in his
burglaries with Hagerty and Marlow.  Far from being vulnerable to authoritarian and
manipulative people, DeYoung himself "is likely the manipulator."

[18]Dr. Sachy cited "the extensive evidence of Mr. DeYoung's clear thinking, socially
appropriate behavior and successful functioning on a daily basis."  Dr. Sachy noted that
DeYoung was able to perform the responsibilities of a manager at Burger King, to "co-exist with
his family without documented behavior disturbances or acts of violence," to compose lengthy
treatises documenting records of past criminal activities and plans for future ones, to commit a
number of burglaries without detection, to excel at school and in the ROTC program.  Moreover,
with respect to the murders themselves, DeYoung was able to: (1) "'cleanse' his room of
incriminating materials prior to the murder[s] and hide them in a remote location"; (2) "murder
three family members sequentially, without decompensating psychologically"; and (3) "return to
his home after the murders and calmly and consistently tell the police that he had nothing to do
with the deaths of his family."

DeYoung's new ineffective assistance claims were procedurally defaulted because they could have been raised by new appellate counsel Wilson in the motion for new trial and on direct appeal, and (3) found that, in any event, DeYoung had not shown deficient performance by either trial or appellate counsel or any prejudice.[19]

DeYoung argued that his trial and appellate counsel's failure to preserve certain issues for habeas review constituted ineffective assistance of counsel so as to satisfy the cause prong of the cause and prejudice test for excusing procedural default. The state habeas court found that, even assuming that were true, "DeYoung has <u>not</u> shown that the identified instances of alleged ineffective assistance of counsel were of sufficient importance that they prejudiced his defense <u>with regard to the verdict of guilty and sentence of death</u> such that the otherwise valid procedural bar should be excused." The state habeas court concluded that all DeYoung's ineffective trial counsel claims not raised in DeYoung's motion for

---

[19]The state habeas court said:

This court has carefully reviewed the trial record, the evidence adduced at the evidentiary hearing, the arguments of counsel, and the law applicable to DeYoung's claims. This court concludes that, even if this claim was not procedurally defaulted, which this court has ruled, trial counsel and appellate counsel performed both reasonably and effectively in their representation of DeYoung. DeYoung has failed to establish that the performance of trial counsel or appellate counsel fell below an objective standard of reasonableness or that DeYoung suffered actual prejudice as a result of any unreasonable performance by trial counsel or appellate counsel. DeYoung's claim of ineffective assistance of trial counsel and appellate counsel must fail both as a separate claim of relief and as cause to excuse the procedural default of issues raised for the first time in this habeas corpus proceeding.

new trial and on direct appeal were procedurally defaulted, and that DeYoung showed "[n]o cause or prejudice . . . to excuse this procedural default."

Alternatively, the state habeas court denied each ineffective assistance claim on the merits, as outlined below. The court rejected DeYoung's claim that Jones and O'Brien failed to conduct an adequate pretrial investigation into the State's case and potential defenses. The state habeas court found that: (1) Jones and O'Brien's strategy for the penalty phase was to rely on residual doubt and the testimony of DeYoung's family members; (2) for residual doubt, counsel tried to paint Hagerty as being in control on the night of the murders, and to suggest other persons may have been involved; (3) counsel considered presenting mental health evidence, but after consulting with Dr. Messer and Dr. Shaffer, counsel decided mental health evidence would not be helpful; (4) counsel considered presenting mitigation witnesses who were not members of DeYoung's family, but concluded for strategic purposes "that the family members would be the most effective witnesses in mitigation and that the other people available as witnesses would not be helpful, especially since some of the other potential witnesses could testify . . . to matters that would do harm to [DeYoung's] case."

The state habeas court concluded that the performance of DeYoung's trial counsel was not ineffective, stating that "[t]he mere fact that other witnesses might

37

have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." The state habeas court noted that the issue of which witnesses to call, if any, "is the epitome of a strategic decision," one that courts will seldom second-guess.

The state habeas court also rejected DeYoung's claim that Jones and O'Brien were ineffective for not presenting expert testimony on parricide. The state habeas court found trial counsel explored the possibility of presenting parricide testimony, and information on parricide was contained in trial counsel's files, but counsel told the state trial court that "they made a strategy decision not to pursue parricide as a theory in mitigation." The state habeas court also noted that the jury consultant hired by DeYoung's counsel warned them it would be inappropriate to put forth evidence tending to malign the victims.

Based on the record, the state habeas court found that "trial counsel were fully aware of the concept of parricide but made a strategy decision to pursue a case of [residual] doubt and pleas for mercy from [DeYoung's] family members." Moreover, the state habeas court determined that this strategic choice "was reasonable in light of the fact that no one, including Petitioner himself, gave any indication that any family dysfunction existed." The strategy was also reasonable "in light of the fact that one of trial counsel's own experts suggested that they not

38

malign the names of the victims, which would be required when presenting a theory of parricide to the jury."

Because counsel made a reasonable strategic decision to forgo the use of parricide testimony, counsel's performance was not deficient. In any event, DeYoung could not show prejudice as to this claim.

Similarly, the state habeas court denied DeYoung's claim that his trial counsel were ineffective for not presenting evidence of sexual abuse. DeYoung could not satisfy the performance prong because he failed to show he actually suffered any sexual abuse:

> Petitioner's only alleged "evidence" of [sexual] abuse was the fact that Petitioner's father and sister had a close relationship; that Petitioner's family played a game that involved sitting on each others' laps; . . . and that Petitioner once told someone that his father did "stuff" to him and his siblings that he did not like. Clearly, none of this "evidence" suggests, much less establishes, that Petitioner was sexually abused by his father.
> []      Finally, Petitioner himself has never testified that he was sexually abused by his father when he was growing up. Clearly, the best and most reliable evidence of any abuse would come from Petitioner himself. However, Petitioner has failed to so attest to any alleged abuse and no other evidence establishes any such abuse.

The state habeas court also found that DeYoung failed to establish the prejudice prong of this ineffective counsel sex-abuse claim.

The state habeas court also rejected DeYoung's claim that Jones and O'Brien failed to adequately investigate or present mental health testimony. The

39

state habeas court found that DeYoung was evaluated before trial by Dr. Messer and Dr. Shaffer and DeYoung did not "report any significant dysfunction in his home, any unusual problems with his parents, ideas of reference, depression, or any other significant traits of schizotypal personality disorder or dysthymia." Although trial counsel considered calling Dr. Messer in the penalty phase, Dr. Messer and Dr. Shaffer told counsel that DeYoung had "no real psychiatric defense":

> Although trial counsel considered, at one point, utilizing Dr. Messer during the penalty phase of trial, during a meeting with Petitioner's counsel, Dr. Messer, and Dr. Shaffer prior to trial, the doctors informed counsel that, despite their diagnosis of personality disorders, Petitioner had no real psychiatric defense. The doctors further reported that the best they could attest to was that Petitioner did not show any remorse, or have a normal grief reaction, but rather had the attitude of "I am annihilated or I'll annihilate them."

The state habeas court determined that an ineffective assistance claim "must be evaluated based upon information known to counsel at the time." And DeYoung himself did not personally exhibit behavior or symptoms of schizotypal personality disorder or dysthymia to Dr. Messer or Dr. Shaffer, who both interviewed him. The state trial court found that, at the time of trial, there was no cause for Jones and O'Brien to believe that further investigation of mental health evidence was needed:

> Clearly, at the time of trial, Petitioner did not reveal any behavior or

40

indications that he might suffer from traits of schizotypal personality disorder or dysthymia to Dr. Messer or Shaffer. Additionally, as noted above, the myriad of family and friends contacted by the defense team did not give counsel any reason to believe that Drs. Messer or Shaffer needed any additional information or background about Petitioner's childhood; rather, the family and friends reported that Petitioner belonged to a quiet, religious, middle-class family who did not share much of their lives with outsiders. Thus, there were no indications to trial counsel nor to Drs. Messer or Shaffer that a further investigation into Petitioner's background was warranted, or that Petitioner might suffer from a mental ailment more useful to a defense or mitigation phase of a death penalty case than those diagnosed by the doctors.

DeYoung had "a responsibility to assist in his defense and provide honest and accurate information to his counsel and defense team." Because DeYoung did not indicate any traits of schizotypal personality disorder or dysthymia to Dr. Messer or Dr. Shaffer, Jones and O'Brien "were not unreasonable to rely upon their experts' opinions that [DeYoung] was not laboring under a psychological disorder or disease that should be presented to the jury in mitigation."[20]

The state habeas court "place[d] no weight" on Dr. Sultan's testimony in her affidavits. The state trial court concluded that Jones and O'Brien, "[w]hen making their decision not to present mental health evidence to the jury, . . . made an

---

[20]The state habeas court also stated that (1) DeYoung had no previous history of mental illness or mental health treatment, (2) no potential witness interviewed by the defense team indicated DeYoung might have a mental illness, and (3) the evaluations conducted by Dr. Messer and Dr. Shaffer failed to reveal any mental infirmities they thought would be useful to present. The state habeas court determined that the affidavits of Dr. Messer and Dr. Shaffer, reflecting different opinions based on information not available to them before trial, were based on hindsight and had no probative value.

appropriate and reasonable decision based upon information available to them at the time."

The state habeas court also denied DeYoung's claim that Jones and O'Brien failed to reasonably investigate and present other mitigation evidence. The state habeas court noted at the outset that this claim "relies exclusively upon affidavits secured by Petitioner's current counsel that tell tales of Petitioner's parents' and grandparents' lives and neighbors', friends' and acquaintances' impressions of Petitioner's life and the lives of Petitioner's siblings." The state habeas court found "that an overwhelming amount of the testimony contained within these affidavits is inadmissible," and the court "disregard[ed] those portions of the affidavits that contain inadmissible evidence." The state habeas court noted that the mere fact that other testimony or witnesses might have been available does not establish ineffective assistance of counsel.

DeYoung himself presented counsel and Stellmack with names of potential mitigation witnesses, all of whom Stellmack contacted, or tried to contact. The state habeas court found that "trial counsel contacted or attempted to contact a tremendous number of potential witnesses for use during the penalty phase of trial." The state habeas court determined that the "overwhelming majority of the witnesses now presented by Petitioner via affidavit were not known by trial

42

counsel prior to trial."

The state habeas court found that Jones and O'Brien "conducted a full and reasonable investigation into potential mitigation witnesses," and they "were not unreasonable for failing to uncover the names of additional possible witnesses that were unknown to them at the time of trial." Moreover, "it was reasonable for trial counsel to believe that Petitioner had given them all of the names of possible witnesses that might have the ability to assist during the mitigation phase of trial." The state habeas court determined that:

> It would be patently unreasonable to expect counsel to go on a wild goose chase for names of individuals tangential to Petitioner's life from whom a slim possibility of useful and mitigating information might arise. Rather, it was much more reasonable to rely upon Petitioner to supply defense counsel with the names of those people most likely to have information about Petitioner's own life and character. Therefore, trial counsel was not ineffective for failing to discover alleged potential mitigation witnesses of whom they were not aware prior to trial, and counsel's performance in discovering potential mitigation witnesses was not deficient.

Additionally, the state habeas court found that those potential witnesses contacted by DeYoung's trial counsel who later submitted affidavits in the habeas proceedings "were not as forthcoming with their information and knowledge prior to trial as they seem to have been for Petitioner's habeas corpus counsel." Accordingly, DeYoung did not show that the evidence submitted in the affidavits was available at the time of trial, and Jones and O'Brien's performance was not

43

deficient for not eliciting this new evidence.

Importantly too, the state habeas court found that many of the witnesses whom DeYoung's trial counsel interviewed and later submitted affidavits would have revealed information harmful to DeYoung's case. The state habeas court cited witnesses Cooper Etheridge and Daphne Collins, who "would have testified that [DeYoung] talked about hating his parents and family and wanting to kill them." The state habeas court found that "while these witnesses may now have information that could have been beneficial to Petitioner's case, the damage that would have been done by this other information far outweighs the benefits to the point that no reasonable attorney would have risked presenting such individuals as witnesses on Petitioner's behalf." Thus, the state habeas court concluded "it was entirely reasonable for counsel to not present witnesses such as Mr. Etheridge and Ms. Collins as witnesses on petitioner's behalf."

As to DeYoung's claim that his trial counsel failed to call Nathan in the penalty phase, the state habeas court noted that: (1) trial counsel testified during pretrial proceedings that "extensive efforts were made to contact Nathan, to no avail," and that Stellmack called "regularly," about three times per day, but reached an answering machine; (2) at the habeas hearing, Stellmack testified he tried more than once to contact Nathan; (3) after Nathan moved out of Harmon's house,

44

Stellmack tried to speak with Nathan several times, but was forced to leave messages; and (4) Nathan never returned Stellmack's phone calls. The state habeas court found that "although trial counsel made reasonable attempts to contact Nathan and to speak with him in an effort to possibly secure his testimony, Nathan clearly had no intention of assisting the defense in Petitioner's case." Because Jones and O'Brien could not force Nathan to speak with them, their performance was not deficient.

Alternatively, the state habeas court concluded DeYoung could not show prejudice from any failure to call Nathan because DeYoung "failed to establish what types of information trial counsel could have learned from Nathan DeYoung if he had spoken with counsel prior to trial that would have affected the outcome of the trial."

As to potential issues not raised in the motion for new trial or on direct appeal, the state habeas court found that appellate counsel Wilson was in contact with DeYoung throughout the representation, including through written correspondence, and none of DeYoung's correspondence with Wilson mentioned any dysfunction within DeYoung's family.

The state habeas court determined DeYoung did not show that Wilson failed to present any "significant and obvious issues on appeal." The state habeas court

45

found that Wilson's "investigation into and preparation for [DeYoung's] appeal, and [Wilson's] winnowing down of appealable issues to the 18 'significant and obvious' issues that he raised at the motion for new trial and on appeal, constitute effective performance." DeYoung did not show he was prejudiced by Wilson's conduct because "raising any additional instances of ineffective assistance of trial counsel would not have been successful on appeal." As a result, the state court concluded, "DeYoung's claim of ineffective assistance of appellate counsel must fail both as a separate claim of relief and as cause to excuse the procedural default of issues raised for the first time in this habeas corpus proceeding."

## J.    State Habeas Appeal

On January 20, 2004, the Georgia Supreme Court denied DeYoung's application for a certificate of probable cause to appeal. The United States Supreme Court denied DeYoung's petition for certiorari. DeYoung v. Schofield, 543 U.S. 892, 125 S. Ct. 168 (2004).

## K.    Federal Habeas Proceedings

In May 2004, DeYoung filed his § 2254 petition, which alleged, inter alia, claims of ineffective trial and appellate counsel. In June 2007, the district court denied as procedurally barred all the claims DeYoung did not raise in his motion for new trial or on direct appeal.

46

In August 2007, the district court issued a final order finding DeYoung was not entitled to federal habeas relief or an evidentiary hearing. The district court found trial counsel were not ineffective in investigating and presenting mitigation evidence and, thus, appellate counsel was not ineffective in failing to raise this issue in the new trial motion or on direct appeal. The district court granted a certificate of appealability ("COA") on DeYoung's ineffective trial and appellate counsel claims.[21]

## II. STANDARD OF REVIEW

We review the district court's denial of DeYoung's § 2254 federal habeas petition de novo. Cummings v. Sec'y for the Dep't of Corr., 588 F.3d 1331, 1355 (11th Cir. 2009), petition for cert. filed (U.S. Jun. 7, 2010) (No. 09-11289). However, we, like the district court, "owe deference to the final state habeas judgment." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1239 (11th Cir. 2010), petition for cert. filed (U.S. Jun. 7, 2010) (No. 09-11314). This Court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1247 (11th Cir.

_____

[21]The district court also granted a COA as to ten other issues, including the district court's denial of DeYoung's motion for an evidentiary hearing. We find no error in the denial of an evidentiary hearing and affirm on that issue. DeYoung makes no arguments as to the other issues for which he was granted a COA. DeYoung therefore waives those issues. See Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) (stating that issues not raised in party's initial brief are deemed waived).

2009), cert. denied, — S. Ct. —, 78 U.S.L.W. 3579 (U.S. Apr. 5, 2010) (No. 09-8930).

> Under AEDPA's highly deferential standard for reviewing state court judgments, a federal court may not grant habeas relief on claims previously adjudicated on the merits by a state court unless the state court adjudication resulted in a decision that was (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. (quotation marks omitted); see 28 U.S.C. § 2254(d).

### III. DISCUSSION

On appeal, DeYoung argues the district court erred in denying his § 2254 petition because his trial counsel were ineffective in the penalty phase and therefore his appellate counsel was ineffective for not raising this issue in his new trial motion and on direct appeal.[22]  First we discuss the governing legal standards.

---

[22]Both the state habeas court and the district court determined that DeYoung's claims of ineffective trial counsel performance (except for trial counsel's failure to call Butler, Albright, and Fisher as witnesses) were procedurally barred because appellate counsel Wilson had not raised them in the new trial motion and on direct appeal.  Those courts alternatively denied DeYoung's trial counsel claims on the merits.  Although an alternative merits holding will not obviate a procedural bar, Philmore v. McNeil, 575 F.3d 1251, 1260 (11th Cir. 2009), cert. denied, 130 S. Ct. 1884 (U.S. Mar. 22, 2010), we find it easier not to address the procedural bar issue here because: (1) DeYoung points out that Wilson was representing him at the new trial and direct appeal stage where he had a constitutional right to counsel and argues Wilson's ineffectiveness is cause to excuse the procedural bar; and (2) to determine whether Wilson rendered ineffective assistance in omitting the ineffective trial counsel claims in the motion for new trial or on direct appeal, we would review the merits of the omitted claims.  Id. at 1264-65.  Rather than wade through these complexities, we discuss the merits of DeYoung's trial counsel claims, as that alone resolves the case.

## A. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are governed by the two-pronged test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), under which a defendant must show both (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064.

> As to counsel's performance, "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." <u>Bobby v. Van Hook</u>, 558 U.S. —, 130 S. Ct. 13, 17, 175 L. Ed.2d 255 (2009) (quotation marks omitted). Thus, to establish deficient performance, a defendant must show that his counsel's conduct fell "'below an objective standard of reasonableness' in light of 'prevailing professional norms'" at the time the representation took place. <u>Id.</u> at 16 (quoting <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2064-65). In assessing the reasonableness of counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Id.</u> at 690-91, 104 S. Ct. at 2066.

<u>Reed</u>, 593 F.3d at 1240.

In judging trial counsel's investigation in preparation for the penalty phase of a capital trial, "hindsight is discounted by pegging adequacy to 'counsel's

49

perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 545 U.S. 374, 380-81, 125 S. Ct. 2456, 2462 (2005) (citation omitted). Counsel has "no absolute duty to investigate particular facts or a certain line of defense," although in some circumstances, "a complete failure to investigate may constitute deficient performance of counsel." Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787 (11th Cir. 2003); see also Housel v. Head, 238 F.3d 1289, 1294 (11th Cir. 2001) (noting that a "failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history"). However, "counsel need not always investigate before pursuing or not pursuing a line of defense. . . . [C]ounsel is not required to pursue every path until it bears fruit or until all hope withers." Chandler v. United States, 218 F.3d 1305, 1318 (11th Cir. 2000) (en banc) (quotation marks omitted).

The prejudice prong requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. For penalty-phase ineffectiveness claims, the prejudice question "is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did

50

not warrant death." Id. at 695, 104 S. Ct. at 2069.

> In considering whether prejudice exists, courts must look at all the available mitigation evidence – both the trial evidence and the evidence adduced during postconviction proceedings – and then re-weigh that evidence against the evidence in aggravation. Williams v. Taylor, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515, 146 L.E. 2d 389 (2000). In that process, what matters is not merely the number of aggravating or mitigating factors, but their weight. Van Hook, 130 S. Ct. at 20.

Reed, 593 F.3d at 1240-41.

DeYoung raises a host of alleged deficiencies in his trial counsel's performance, which we divide into three categories: (1) investigation and presentation of evidence of DeYoung's family background and social history; (2) investigation, preparation, and presentation of mental health experts and evidence; and (3) implementation of trial counsel's chosen penalty-phase strategies of residual doubt and mercy pleas from DeYoung's family members.

## B.    Performance Prong:  Family Background/Social History

DeYoung contends his trial counsel Jones and O'Brien were ineffective for not adequately investigating and presenting evidence of DeYoung's family background and social history. The state habeas court's conclusion that DeYoung did not satisfy the performance prong of the ineffective assistance test is not contrary to clearly established federal law, does not involve an unreasonable application of clearly established federal law, and is not based on an unreasonable

51

determination of the facts in light of the evidence presented in the state court proceeding.

First, Jones and O'Brien conducted an extensive investigation into possible mitigation evidence. Both attorneys interviewed potential witnesses. O'Brien traveled to Iowa, Ohio, and Michigan to talk to members of DeYoung's family. Trial counsel retained investigator Stellmack and mitigation specialist Leonard. Stellmack subpoenaed DeYoung's school and work records and compiled a list of more than forty possible mitigation witnesses, including DeYoung's relatives, fellow church members, co-workers, friends, neighbors, and college and high school teachers. Someone from the defense team tried to contact every person on the list.[23] DeYoung's counsel argues that some evidence suggests the possibility that DeYoung might have been incestuously abused. What counsel ignores is that neither DeYoung, nor anyone else for that matter, ever testified that DeYoung was abused by either parent.

Second, after having DeYoung's mental health evaluated and interviewing numerous possible mitigation witnesses, trial counsel made strategic choices that shaped the course of the final preparation. Before Jones was appointed to represent

---

[23]DeYoung argues that Jones and O'Brien "exaggerated" the extent of their discussions with DeYoung's family. However, after reviewing the state court record, we conclude that the state habeas court's findings on the extent of counsel's investigation were not unreasonable in light of the evidence presented. See 28 U.S.C. § 2254(d)(2).

DeYoung, defense counsel's penalty-phase strategy was "to have the psychiatrist talk about parricide and the dysfunction in the family in situations like this." But when Jones joined the defense team as lead counsel, he took a different approach. Jones's penalty-phase strategy was two-fold: to argue residual doubt and to call family members to plead for a merciful sentence. Jones believed the testimony of DeYoung's family members would be particularly compelling because they were also related to the murdered victims in the case:

> You know, when you have got the family of the victims . . . coming in and asking the jury to spare their grandson's life, I don't know how much more compelling mitigation evidence you can get. . . .
> . . . I don't know what else we could have presented . . . that would have been as good as that.

Jones testified that "we went with what we thought would work at the time." Trial counsel investigated several avenues of potential mitigation, but Jones wanted to avoid a mitigation approach that would involve "trying to trash [DeYoung's] parents" because it might alienate the grandparents, whom Jones saw as potentially the most valuable witnesses.[24]

Third, as the state habeas court found, many of the witnesses trial counsel contacted, including several who later furnished affidavits to state habeas counsel,

---

[24]Moreover, as DeYoung's parents and sister were the victims in the case, and his brother an intended victim, it is highly possible that a mitigation strategy that included evidence critical of DeYoung's family and upbringing might have alienated the jury and hurt his cause.

53

were reluctant to testify at trial. After interviewing potential witnesses, Stellmack told O'Brien that "no one is exactly jumping at the idea of testifying on [DeYoung's] behalf." Stellmack testified, "People were pretty reluctant to even become involved or be associated with the case."

Even DeYoung's grandparents were initially reluctant to testify. Nathan DeYoung never returned Stellmack's calls, and Nathan's girlfriend told Stellmack that Nathan had no interest in testifying. DeYoung's minister, Chris Devos, was "hesitant to discuss a lot of details," and informed Stellmack only "what you would expect from a pastor," that is, that the DeYoungs "attended his church, they came to church on a regular basis, they seemed like a nice family." Stellmack tried to interview DeYoung's co-workers, but except for Kathy Albright, they refused to talk to him. Stellmack testified that "it was really difficult to find anyone, either in the church group or in the neighborhood[,] that could really shed a lot of light on the family dynamics of the DeYoung family."

Moreover, some of the witnesses who eventually provided affidavits to state habeas counsel had information that was harmful. For example, there was evidence that DeYoung sold marijuana at the Burger King where he worked, and Jones and O'Brien were hesitant to call DeYoung's co-workers who might be able to testify to that. And O'Brien was concerned that if DeYoung's college professors

54

testified about a decline in DeYoung's academic performance around the time of the murders, the jury might find that testimony "suggestive of the fact that something was going on." Daphne Collins told defense counsel that DeYoung told her he hated his parents and wanted them dead, and Cooper Etheridge told defense counsel he was not surprised by news of the murders because DeYoung had mentioned killing his parents and, in fact, said that "he wanted to kill everybody."

Given the record in this case, the state habeas court's decision that DeYoung's trial counsel's performance was not deficient is consistent with established Supreme Court precedent. Counsel investigated different lines of mitigation and then made a strategic choice to employ residual doubt and family plea for mercy approaches in the penalty phase. Again, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066. Under the circumstances, counsel's choices, and their investigation, fell well within "the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066.

DeYoung's attempts to analogize this situation to Wiggins v. Smith, 539

U.S. 510, 123 S. Ct. 2527 (2003), and <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), are unavailing. In <u>Wiggins</u>, trial counsel performed no investigation into the defendant's personal history other than reading a one-page summary in the presentence investigation report ("PSI") and obtaining department of social services ("DSS") records. <u>Wiggins</u>, 539 U.S. at 523-24, 123 S. Ct. at 2536. Moreover, Wiggins's counsel did not investigate Wiggins's childhood, even though: (1) the PSI noted Wiggins's "misery as a youth," quoted Wiggins's own description of his background as "disgusting," and observed that Wiggins spent most of his life in foster care; and (2) the DSS records revealed Wiggins's mother "was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." <u>Id.</u> at 523-25, 123 S. Ct. at 2536-37. Wiggins's counsel discovered no evidence suggesting that further investigation would be fruitless or a mitigation case counterproductive, and the record showed that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." <u>Id.</u> at 525-26, 123 S. Ct. at 2537. And in <u>Williams</u>, the defendant's trial counsel did not begin to prepare for the penalty phase until a week before trial, and "failed to conduct an investigation that would have

56

uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." Williams, 529 U.S. at 395, 120 S. Ct. at 1514.

The present case is easily distinguishable from Wiggins and Williams, as Jones and O'Brien conducted an extensive investigation and made express strategic choices. This case is more akin to Bobby v. Van Hook, 130 S. Ct. 13, 19 (2009), in which the Supreme Court recognized a point of diminishing returns in the broad search for mitigating evidence:

> Despite all the mitigating evidence the defense did present, Van Hook and the Court of Appeals fault his counsel for failing to find more. What his counsel did discover, the argument goes, gave them "reason to suspect that much worse details existed," and that suspicion should have prompted them to interview other family members–his stepsister, two uncles, and two aunts–as well as a psychiatrist who once treated his mother, all of whom "could have helped his counsel narrate the true story of Van Hook's childhood experiences." But there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. The ABA Standards prevailing at the time called for Van Hook's counsel to cover several broad categories of mitigating evidence, which they did. And given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents. This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, cf. Wiggins, 539 U.S., at 525, 123 S. Ct. 2527. . . . It is instead a

57

case, like <u>Strickland</u> itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

<u>Van Hook</u>, 130 S. Ct. at 19 (citations omitted).

## C.    Performance Prong:  Mental Health Evidence

DeYoung also argues Jones and O'Brien were ineffective in failing to adequately investigate mental health issues, prepare mental health experts, and present mental health expert testimony.  The state habeas court's denial of this claim is not contrary to, or an unreasonable application of, Supreme Court precedent.  Nor is it based on an unreasonable determination of the facts.

First, almost all of the evidence that DeYoung now claims his mental health experts needed was available to DeYoung himself, yet DeYoung did not reveal it to his counsel or the two pretrial mental health experts, Drs. Messer and Shaffer. "In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant."  <u>Newland v. Hall</u>, 527 F.3d 1162, 1202 (11th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1336 (2009).  Indeed, a defense attorney "does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him."  <u>Id.</u> Here, there is no evidence that DeYoung mentioned to his trial or appellate counsel or to any mental health experts (before trial or even afterward) that he had any

58

family history of mental illness or that there was significant internal strife or dysfunction in his family. Two mental health experts thoroughly evaluated DeYoung in person before trial and did not diagnose him with the mental infirmities DeYoung now claims he suffered. Importantly, to date DeYoung has never indicated he suffered any sexual or physical abuse, nor has anyone witnessed such abuse of DeYoung.

Second, as with the family background and social history evidence, DeYoung's counsel performed a reasonable investigation into mental health issues. Jones and O'Brien retained Dr. Messer and Dr. Shaffer, who each conducted an independent evaluation supported by document review and one or more in-person clinical interviews. Jones and O'Brien met with Drs. Messer and Shaffer to discuss their diagnoses before deciding whether to present a mental health-based defense. Jones and O'Brien decided not to present mental health evidence at the penalty phase because, as Jones testified, they determined "it was not helpful."

Although DeYoung now contends that trial and appellate counsel should have provided more family information to the mental health experts, and that that information would have changed their diagnoses, the state habeas court's conclusion that trial counsel reasonably investigated DeYoung's family background and social history is consistent with clearly established federal law and

59

is not unreasonable in light of the facts. This is especially accurate given that DeYoung never gave any indication of sexual or physical abuse. Given the many witnesses trial counsel or the investigator interviewed, the mere fact that additional family and social history witnesses have now been discovered does not make trial or appellate counsel ineffective. The record also supports the state habeas court's findings that a number of the witnesses who gave affidavits to habeas counsel were not as forthcoming prior to trial and that a significant portion of the testimony in the affidavits was inadmissible (such as for being pure hearsay).

Third, DeYoung does not argue that his trial counsel should have presented mental health expert testimony as to Dr. Messer's and Dr. Shaffer's original diagnoses of borderline personality disorder and narcissistic personality disorder. He argues only that his trial and appellate counsel should have discovered and presented evidence that DeYoung had schizotypal personality disorder and dysthymia (the subsequent diagnosis). However, even if trial counsel had presented such testimony, it would have opened the door to harmful evidence, such as: (1) the original diagnoses of Dr. Messer and Dr. Shaffer, which disorders have been found not to be mitigating, see, e.g., Reed, 593 F.3d at 1248 (11th Cir. 2010) (concluding psychologist's diagnosis of defendant with antisocial personality disorder and narcissistic personality disorder was harmful instead of mitigating);

60

(2) Dr. Sachy's testimony that DeYoung had no personality disorder and was malingering (which would have reinforced the State's picture of DeYoung as having a cunning and manipulative criminal mind); and (3) other characteristics of schizotypal personality disorder itself, including peculiar or eccentric behavior and lack of close friends or confidants other than first-degree relatives (accentuating that DeYoung lacked close friends and chose to kill for financial gain even those few persons close to him).

Fourth, DeYoung provides no evidence indicating trial counsel had a reasonable basis to suspect, at the time, that providing Dr. Messer and Dr. Shaffer with more background information on DeYoung was likely to change their diagnoses. See Wiggins, 539 U.S. at 523, 123 S. Ct. at 2536 (noting that inquiry into reasonableness of counsel's performance "includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and that "[e]very effort [must] be made to eliminate the distorting effects of hindsight" (alterations in original) (quotation marks omitted)); see also Reed, 593 F.3d at 1242 ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.").

D.    **Performance Prong:  Penalty Phase Strategy**

61

DeYoung makes several allegations of deficient performance by his trial counsel in implementing their chosen penalty-phase strategy of presenting pleas for mercy from DeYoung's family members and arguing residual doubt. Specifically, DeYoung argues trial counsel performed in an objectively unreasonable manner by choosing: (1) to call grandmother Letha DeYoung to testify; (2) not to call Nathan DeYoung to testify; (3) not to present letters from DeYoung's extended family members; (4) not to adequately attack Hagerty as a violent man who had a greater role in the murders than he admitted; and (5) not to refute the State's footlocker evidence. Having reviewed DeYoung's arguments and the record, we conclude that, other than the claim regarding Nathan DeYoung, each of DeYoung's arguments as to the alleged deficiency of trial counsel's penalty-phase presentation constitutes an improper attempt to second-guess a reasonable strategic choice of trial counsel. See Rhode v. Hall, 582 F.3d 1273, 1284 (11th Cir. 2009) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." (brackets omitted)), cert. denied, 78 U.S.L.W. 3714 (U.S. Jun. 7, 2010). This strategy was reasonable because: (1) having the parents of the murdered victims plead for the defendant's life is powerful mitigating testimony; and (2) as we have noted before in several cases, "creating lingering or residual

doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the

most effective strategy to employ at sentencing." Ward v. Hall, 592 F.3d 1144,

1170 (11th Cir. 2010) (quotation marks and brackets omitted). The state habeas

court's rejection of these claims was not contrary to or based on an unreasonable

application of clearly established federal law.[25]

As to not calling Nathan to testify in the penalty phase, the state habeas court

found that Jones and O'Brien made reasonable efforts to contact Nathan to secure

his testimony, but Nathan did not return their calls, indicating he "had no intention

of assisting the defense in Petitioner's case." The evidence in the state habeas

proceeding amply supported this finding.

## E. Prejudice Prong

Even if DeYoung could show deficient performance by his trial or appellate

counsel, he must still show prejudice, that is, that "there is a reasonable probability

---

[25]DeYoung argues trial counsel performed deficiently in calling Letha DeYoung because her testimony introduced prejudicial, damaging evidence of DeYoung's alleged Satanism. In their penalty-phase closing arguments, neither the State nor the defense mentioned Satanism or Letha DeYoung's opinion that it drove DeYoung to commit the murders. Further, there was already some evidence of Satanism in the trial. In DeYoung's police interview, a recording of which was played for the jury, DeYoung was asked whether he was a Satanist or read books on Satanism. DeYoung admitted he "ha[d] some books on witchcraft and stuff in [his] room" but, as to his belief in Satan, stated, "I figure evil will probably win in the end. But I don't really have a preference. I mean, I don't strive for either one. I just kind of take things as they come." In any event, it was not objectively unreasonable for trial counsel to decide that the risk associated with calling Letha DeYoung to testify was outweighed by the potential benefit, given her fervent desire that DeYoung not be executed and that she was the mother of one murdered victim and the grandmother of another murdered victim.

63

that, absent the errors, the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069. The state habeas court concluded DeYoung did not satisfy his prejudice burden. This conclusion is not contrary to established federal law, an unreasonable application of established federal law, or based on an unreasonable determination of the facts in light of the evidence.

The weight of aggravation evidence in this case is immense. DeYoung stands convicted of a carefully planned and premeditated triple murder of his mother, father, and fourteen-year-old sister. The method of killing was a study in brutality. Gary and Kathryn DeYoung were attacked in their beds. Each victim suffered more than three dozen slashing, stabbing, cutting, and chopping wounds. In some areas of the victims' bodies, such as the back of Sarah's neck, the knife wounds overlapped so much it was impossible to determine how many individual wounds they suffered. Many of the wounds were inflicted while the victims were lying down and trying to move around or roll away. Sarah, Gary, and Kathryn DeYoung died of blood loss, shock, and interrupted heart functioning.

The total mitigating evidence pales in comparison. Although the categories of mitigating evidence DeYoung argues should have been presented (e.g., a different mental illness, emotionally distant and oppressive upbringing, and sexual

64

abuse) seem substantial, the actual evidence he submits to comprise those categories is weak or nonexistent. For example, there is no evidence DeYoung was sexually abused. DeYoung himself never said so, nor did he report it to any of the four doctors who examined him. Nor has Nathan ever even implied, much less stated, that any sexual abuse occurred. DeYoung offers no evidence of sexual abuse.

As to mental illness, DeYoung's mental health expert Dr. Sultan opined that DeYoung suffers from schizotypal personality disorder and dysthymia, which compromised DeYoung's judgment and ability to function interpersonally. The state habeas court wholly discredited Dr. Sultan's testimony. In any event, this diagnosis was countered not only by the testimony of the State's mental health expert, Dr. Sachy (who said DeYoung did not have these disorders), but also by, inter alia, the facts that: (1) Dr. Sultan's evaluation of DeYoung took place seven years after the murders and five years after DeYoung's trial; (2) Dr. Messer and Dr. Shaffer both evaluated DeYoung before trial and neither diagnosed him with these disorders or found that he had any significant psychiatric defenses; and (3) before the murders, DeYoung was capable of functioning well enough to attend college, to be a manager at Burger King, and to have relationships with friends and girlfriends. And, as explained earlier, such mental health evidence would have

65

opened the door to harmful testimony which may well have eliminated any mitigating weight in the overall equation.

As to the testimony about the DeYoung family's social dysfunction, DeYoung proffered evidence, from various acquaintances and other sources, suggesting that the DeYoungs were socially inept, private people who showed little emotion; that Gary DeYoung was hyper-rational, judgmental, authoritarian, obsessive, and emotionally distant; that Kathryn DeYoung was isolated and submissive; that Gary and Kathryn DeYoung showed DeYoung little affection, and afforded him little freedom or control; and that the DeYoung's home was extremely cluttered. We note that DeYoung himself never said anything to confirm these opinions. DeYoung in fact said he missed his parents. Other witnesses contradicted this picture painted by the habeas affidavits. In any event, all of the family dysfunction testimony, even taken together and credited as true, is weak and a far cry from the horrific childhood circumstances that have been held sufficient to satisfy the prejudice prong in a capital case. See Rompilla v. Beard, 545 U.S. at 391-92, 125 S. Ct. at 2468-69 (stating that overlooked mitigation evidence included evidence that Rompilla's parents were alcoholics, his father frequently beat his mother and bragged about his infidelity, his father beat Rompilla and locked him and his brother in an excrement-filled dog pen, Rompilla

slept in an unheated attic, and he was given no clothes and went to school in rags);

Wiggins, 539 U.S. at 534-35, 123 S. Ct. at 2542 (noting evidence, inter alia, of "severe privation and abuse in the first six years of . . . life," and "physical torment, sexual molestation, and repeated rape during . . . subsequent years in foster care");

Williams, 529 U.S. at 395, 120 S. Ct. at 1514 (finding counsel failed to put on graphic evidence of defendant's "nightmarish childhood" that included his parents' imprisonment for criminal neglect of him and his siblings, his severe and frequent beatings by his father, and his commitment to an abusive foster home).

Having carefully reviewed the record, we conclude that the state habeas court reasonably found that even if DeYoung had offered, and the state trial court had admitted, all the mitigation evidence DeYoung submitted in the state habeas proceeding, it would not have been sufficient to raise a reasonable probability of a different sentence in light of the strong evidence in aggravation. DeYoung therefore has not satisfied the prejudice prong of the ineffective-counsel test.

## IV. CONCLUSION

We affirm the district court's denial of DeYoung's § 2254 petition.

**AFFIRMED.**

67

EDMONDSON, Circuit Judge, concurs in the judgment.